FILED
 2012 Mar-28 PM 04:00
U.S. DISTRICT COURT
    N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| LUCIA HERNANDEZ GUERRA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CV-10-BE-2532- E |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. Introduction**

On April 27, 2006, the claimant, Lucia Hernandez Guerra, who appeals to this court as a *pro se* litigant, applied for disability insurance benefits under Title II of the Social Security Act. (R. 94). The claimant alleges disability, commencing on November 08, 2005, because of a right arm injury, and at the hearing, her attorney advised the ALJ that she was also claiming disability as a result of cervical spine problems; joint arthrosis and bursitis, and an Arnold-Chiari malformation (a compression of the brain stem or spinal chord at the base of the skull when the brain protrudes through a hole in the skull). (R. 112). The Commissioner denied the claims on August 03, 2006. (R. 53). The claimant filed a timely request for a hearing before an Administrative Law Judge on August 24, 2006, and the ALJ held a hearing on October 14, 2008. (R. 59, 23). In a decision dated February 02, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, was ineligible for disability insurance benefits. (R. 22). On July 15, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the

Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the decision of the Commissioner will be reversed and remanded.

## II. Issues Presented

The claimant, who is acting *pro se* on appeal and does not speak English, filed a letter attaching several post-decision medical records but did not file a legal brief articulating specific errors in the Commissioner's decision. This case implicates several issues: (1) whether the ALJ erred in calculating claimant's age at the alleged onset date instead of her age at the date of the hearing and/or decision, and thus, misapplied the Medical-Vocational Guidelines; (2) whether the ALJ erred in not addressing claimant's Arnold-Chiari formation as a serious impairment; (3) whether the ALJ erred in failing to give the proper weight to the opinions of claimant's treating physicians; and (4) whether the ALJ erred in failing to develop the record; and (5) whether the claimant's submission of additional evidence at this level warrants remand pursuant to sentence six of U.S.C. § 405(g) for consideration of the additional documents.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if he applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2006); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that substantial evidence supports. Substantial evidence is more than a mere scintilla. It means evidence that a reasonable mind could accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court not only must look to the parts of the record that support the decision of the ALJ but also must view the record in its entirety and take account of evidence that detracts from the evidence upon which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Legal Standard

A person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2006). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920 (2011).

If the ALJ determines that the claimant cannot perform any past relevant work at step four and the claimant's impairments only produce exertional limitations, then the ALJ should use the Medical Vocational Guidelines (grids) to determine whether the claimant can perform other work at step five. 20 C.F.R § 404.1569. As in this case, if the ALJ uses the grids to determine disability, the ALJ should use the claimant's age at the time of decision, not at the alleged onset date, to apply the guidelines. *See, e.g., Crook v. Barnhart*, 244 F. Supp. 2d. 1281, 1283 (N.D. Ala. 2003) (citing *Varly v. Secy'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987) ("For purposes of determining age under the grids, 'the claimant's age as of the time of the decision governs.'")).

Absent a showing of "good cause," the Secretary must accord substantial or considerable weight to the opinions of treating physicians. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also* § 1527(d) (stating that generally, the ALJ must give more weight to the opinion of a doctor who has examined a claimant than to the opinion of one who has not). Therefore, the Secretary must specify the weight accorded to each treating physician's opinion. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). If the ALJ gives less weight to the opinion of a treating physician, he must clearly articulate the reasons for doing so, and the failure to clearly articulate his reasons constitutes reversible error. *Lewis v. Callahan*, 125 F. 3d 1436, 1440 (11th Cir. 1997). Further, substantial evidence must support the articulated reasons. *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1992).

## V. Facts

The claimant completed a high school equivalent education in Cuba, and her date of birth was July 6, 1962; she was forty-six years old at the time of the administrative hearing. (R. 22,

48). The claimant does not speak English. (R. 111). In the past, she has worked as a poultry cutter, cabinet assembler, and cabinet sander. (R. 119-31). The claimant alleged she was unable to work as of November 08, 2005 because of right arm injury resulting from a work accident. (R. 113, 129).

*Physical Limitations*

On October 31, 2002, the claimant injured her right arm and shoulder in an unspecified accident while working for a cabinet company. (R. 129). The first medical evidence in the record comes from a follow-up visit with treating physician Dr. Graham Howorth, an orthopedic surgeon, on August 18, 2005.  Dr. Howorth reported that the claimant had been experiencing chronic pain since an unspecified surgical procedure performed on May 01, 2003. To reassess the pain, Dr. Horoworth requested a MRI scan. (R. 169). On August 25, 2003, the claimant returned to Dr. Howorth and reported "severe increasing pain" when she attempted to work, despite work restrictions preventing her from lifting anything over five pounds. Dr. Howorth ordered the claimant to completely stop work until the MRI scan was completed. (R. 168). On August 28, 2003, Dr. Howorth reported that the MRI was normal and the claimant had reached maximum medical improvement. Dr. Howorth ordered a functional capacity evaluation and recommended that the claimant be placed on light-duty work activity, should not lift anything over twenty-five pounds, and should not use her right arm above shoulder level. (R. 168).

On September 25, 2003, Dr. Howorth reported that the claimant could lift thirty-five pounds occasionally, twenty pounds frequently, and five pounds constantly according to her functional capacity evaluation. Additionally, the claimant could do "shoulder lifting" one to forty-two times per day. Apart from this report, the record contains no documentation of the

functional capacity evaluation. (R. 164).

On November 06, 2003, the claimant returned to Dr. Howorth reporting pain and swelling in her arm even without movement. Dr. Howorth informed the claimant that he could find no source for her pain and could order an additional MRI scan that would not be covered under Workman's Compensation. The claimant agreed to the MRI. (R. 163). On December 01, 2003, Dr. Howorth reported that the MRI revealed a "pronounced" Arnold-Chiari Type I malformation and that "one-half of the medulla and cerebellum appear herniated through the foramen magnum" (the hole at the base of the skull). Dr. Howorth also opined that the Arnold-Chiari formation, which was not related to her on-the-job injury, "is most probably contributing to her current problem." Dr. Howorth referred the claimant to Dr. Hamo, a neurologist, for these problems. (R. 162).

On December 22, 2003, the claimant returned to Dr. Howorth's office and reported that she had not seen Dr. Hamo because he would not see patients without insurance. Dr. Howorth noted that the herniated portions of her brain were "very serious ... could cause death or permanent weakness, numbness, and this needs to be evaluated by Neurology and Neurosurgery." (R. 161). He opined that her symptoms were related to the brain herniation. On January 12, 2004, the claimant returned to Dr. Howorth reporting "electricity-like" pain running the length of her arm. The claimant still had not seen a neurologist because of a lack of insurance, and Dr. Howorth reiterated that she must see a neurologist even if she had to take out a loan. (R. 160).

On August 12, 2004, treating physician Dr. Jeffery Davis, an orthopedic surgeon, performed a second operation on claimant involving her right shoulder - a right shoulder arthroscopy. During the operation, Dr. Davis removed scar tissue and a bone spur. (R. 178).

No medical evidence exists in the record between August 12, 2004 and a April 02, 2005 report from Dr. Karl Hofammann, an orthopedic surgeon. According to the claimant's attorney at the hearing, Dr. Hofammann treated the claimant for neck and shoulder pain. Despite clearly missing pages, the report essentially stated that the claimant was at maximum medical improvement despite ongoing pain. (R. 243). On April 21, 2005, Dr. Hofammann's report summarized results of an X-ray report showing tendonitis, bursitis, and mild impingement in the spine, and a "left sided oncovertibral spur" in the neck "with associated foramen narrowing at 5,6 and 6,7." (R. 241).  Otherwise, that report and the follow-up report from a doctor visit on April 25, 2005 reiterated the same findings Dr. Hofammann had reflected in his earliest report.  He referred the claimant back to Dr. Davis as the claimant's most recent operating doctor. (R. 236, 239).

On July 14, 2005, the Clay County Hospital's physical therapy department estimated that the claimant had a full range of motion, despite reporting pain. The physical therapy department discontinued treatment because the claimant was uncooperative. (R. 179). On July 27, 2005, the claimant visited Dr. Davis for continuing pain and problems completing her work. Dr. Davis acknowledged that the claimant had an Arnold-Chiari malformation, noted neck tenderness, and opined that the claimant's pain problems were coming from her neck. However, Dr. Davis thought the neck problems were not a "compensable injury," presumably indicating that worker's compensation would not cover it.  (R. 173).

On August 18, 2005, the claimant visited treating physician Dr. George Smith, a family doctor. Dr. Smith diagnosed the patient with tendinitis and a possible nerve root damage in her neck, stating that he believed her pain originated in her neck, not her shoulder, and that the pain

moved from her neck to her shoulder. (R. 191). On August 31, 2005, Dr. Smith reported that past MRI results indicated "some disease" and referred the claimant to an unidentified orthopedist. (R. 191). On September 19, 2005, Dr. Smith reported that the patient visited the orthopedist and no further intervention was needed. (R. 192). On October 04, 2005, the claimant returned to Dr. Smith and he once again referred her to an unidentified orthopedist. (R. 190).

On July 26, 2006, Dr. Ammar Aldaher, an internal medicine specialist, performed a consultative examination on the claimant for the Old Age and Survivors Insurance (OASI) program. Dr. Aldaher diagnosed the claimant with right shoulder pain, neck pain, and musculoskeletal pain. (R. 225).

On September 25, 2006, the claimant returned for a follow-up with Dr. Hoffammann after receiving an unspecified "shot [that] only helped her for 5 or 6 days." Dr. Hoffammann diagnosed the claimant with pain in the left and right shoulders, subacromial bursitis (rotator cuff disorder), impingement with AC joint degenerative arthrosis (pressure on the joint causing joint deterioration), left sided oncovertebral spurring (bone spur), suprasinatus tendonosis (inflamed tendon), oncovertebral spurring with foraminal narrowing (spinal disorder), and Arnold Chirari Type I malformation. He noted that the left shoulder MRI did show tendonosis, but that the tendonosis was not "profound enough to cause a full thickness tear." Based on these findings, Dr. Hoffammann referred the claimant to neurosurgeons Dr. Sam Bowen and Dr. Bud Woodall to review the cervical MRI report with the ulnar Chiari formation and left sided foraminal changes in light of her arm pain and shoulder pain. (R. 233).

The record does not reflect medical evidence from Dr. Bowen and/or Dr. Woodall.

The remaining medical evidence in the record is from Dr. James Beretta from March 21,

2007 through April 17, 2008. However, all of these records are illegible in their current state. (R. 251-60). Notably, the record does not include the documents from Dr. Valle or Dr. Kezar mentioned by the claimant at the hearing.

*The ALJ Hearing*

The claimant requested and received a hearing before an ALJ. (R. 25, 59), which was held on October 14, 2008. Originally, the claimant's daughter, Crispus Terjuana, was translating for the claimant; however, she was replaced by Mr. Joe Roca. (R. 25, 27). The claimant testified that she was born on July 6, 1962, which meant that she was 46 years old at the time of the hearing. She further testified that she was disabled because the problems with her "arms" prevented her from working. (R. 28). The claimant's attorney stated that the claimant was disabled because of disc buldges and spurs in her neck area, and pain radiating in her neck to her right shoulder, joint arthrosis, and bursitis. The claimant testified that she received a workman's compensation settlement of "medical attention for life" resulting from a job related accident on October 31, 2002. (R. 29-30, 48).

During the hearing, the ALJ asked the claimant's attorney why he had not mentioned the claimant's Arnold-Chiari Syndrome. The attorney responded that he had that in his notes but he "forgot to mention it." The claimant started to testify about going to Dr. Valle for treatment; however, the ALJ asked the interpreter to "cut her off." The ALJ asked the attorney if he was familiar with Dr. Valle, and the attorney responded that he did not "think were aware of that. [sic]" The ALJ then asked the claimant to state only when and how many times she saw Dr. Valle. The claimant responded that she saw Dr. Valle once in 2003. The ALJ did not allow the claimant to elaborate on her visit, but stated that he thought it must be later than 2003 and asked

9

the attorney to obtain records. Additionally, the attorney stated that he was still waiting on records from Dr. Kezar, but that he did not know why Dr. Kezar treated the claimant.

The ALJ then asked the claimant to answer "yes or no" whether Dr. Beretta was her primary physician, to which the claimant answered, "yes." The attorney and ALJ agreed that Dr. Beretta's reports were illegible. The ALJ then proceeded to verbally summarize the evidence in the record. Although large portions of the transcript identify the testimony as "inaudible," the attorney, vocational expert, and ALJ determined that Dr. Davis's reports indicated that the claimant had a sedentary residual functional capacity.

The ALJ then stated that he "thought this brain thing was going to take us down a different road." The attorney stated that "it looks like it's a fairly serious condition, but there's not really any treatment after [Dr. Howorth's report]." The ALJ then stated that he was "having trouble" looking at Dr. Berretta's report and was not going to "waste any time trying to figure that out." Despite not wanting to examine the records, the ALJ concluded that Dr. Berretta was "still going to be our main man here" and asked the attorney to obtain a medical source opinion from Dr. Beretta.

A vocational expert, Dr. Mary Kessler, also testified at the hearing. Dr. Kessler testified that the claimant had previous experience working as a poultry cutter, sander of cabinets, and possible hoist operator. (R. 47). The ALJ asked Dr. Kessler if a person with Ms. Hernandez's age, education, work history, linguistic skills, and residual functional capacity could perform any other work. In an unclear transcription, Dr. Kessler responded, "No sir, anything sedentary (inaudible)." The ALJ replied "um-hum," and Dr. Kessler continued "and a certain number of jobs (inaudible). Judge, there would be inspectors, sorters, and production workers. Those three

things she might be able to do, but that's not (inaudible)." When the attorney asked if any of the identified jobs could be completed with limited use of a right arm, Dr. Kessler testified that all identified jobs would require bi-lateral handling on a fairly constant basis; if the hypothetical worker of the identified jobs were limited to occasional use of the dominant arm, that limitation would preclude work. After hearing Dr. Kessler's testimony, the ALJ concluded that the "game plan" would be to take thirty days to acquire Dr. Valle's treatment record, Dr. Kezar's record, and a medical source opinion from Dr. Berretta.

*Post-hearing Submissions*

The record reflects that on December 2, 2008, Dr. Baretta's office faxed to the Social Security Administration medical records regarding claimant's office visit dated 11/10/08. Although the fax is difficult to read, the medical record refers to shoulder pain and neck spasms. The administrative record does not include medical records of Dr. Valle or Dr. Kezar.

*The ALJ's Decision*

On February 02, 2009, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 22). First, the ALJ found that the claimant had not engaged in substantial gainful activity since November 08, 2005, the alleged onset date. Second, the ALJ found that the claimant had "right shoulder pain, status post arthroscopy to repair a right shoulder labral tear and partial tear of the rotator cuff, and right shoulder diagnostic arthroscopy," all of which qualified as severe impairments. (R. 16). The ALJ acknowledged that the claimant had an Arnold-Chiari Type I malformation, but did not explain why he did not list this condition as a severe impairment. (R. 17). The ALJ did not limit the severe impairments he considered to those listed in her application, but purported also to consider those she raised at the hearing. However,

in listing the allegedly severe impairments she raised at the hearing, he did not list the Arnold-Chairi malformation but listed the following: "(1) disc bulges and spurs in her cervical spine with pain radiating into her right arm; and (2) joint arthrosis and bursitis." (R. 16). The ALJ summarized the records of several doctors but did not state the weight he gave them. At the end of his step 2 analysis, the ALJ stated that "[i]n determining the nature and severity of Claimant's impairments, I considered the opinion of the State agency medical consultant," Dr. Aldaher. (R. 19).

Third, the ALJ found that the claimant did not have any impairments singly or in combination that met or medically equaled a listing in the Listing of Impairments. (R. 19). Fourth, the ALJ found that the claimant had the residual functional capacity to perform a full range of sedentary work. (R. 17). The ALJ determined that these restrictions prevented the claimant from performing any past relevant work. (R. 21).

To make the RFC assessment, the ALJ stated specifically that he relied on the consultative examination of one doctor: Dr. Aldaher. The ALJ did not specify what weight, if any, he gave to the opinions of the claimant's other physicians. The ALJ found that the claimant's testimony about her subjective symptoms was not entirely credible. Specifically, the ALJ found that her testimony that she had *no* use of her right arm was not credible because it was not consistent with the objective medical evidence in the record. He found instead that her "medically determinable impairments could reasonably be expected to produce *some* limitation of function in Claimant's right arm. . . ." (R. 21).

Fifth, the ALJ found that the claimant's limitations were exertional only and applied the Medical-Vocational Guidelines (the "grids"). Although the ALJ acknowledged that the claimant

did not speak English, he applied the grids based on the claimant's being forty-four years old on the alleged onset date, having a sedentary RFC but no skilled work experience, and having only exertional limitations. The ALJ concluded that Grid Rule 201.23 directed a finding of "not disabled." (R. 21-22).

*Appeals Council*

On appeal, the Appeals Council acknowledged receipt of additional records from Dr. Beretta dated March 31, 2007 through February 11, 2009, but the council stated that as those records related to treatment after the last insured date of December 31, 2006, the new submission did not affect the ALJ's decision.

*New Documents Submitted to this Court*

Claimant submitted in support of her appeal to this court several documents: a record of Dr. Davis dated November 8, 2004 and entitled "Work Restrictions" stating that claimant had a permanent impairment of her right arm of 13% and permanent impairment of her "whole person" of 8%. (Doc. 8, at 2). She also presents the following documents from Dr. Beretta: a form entitled "Request for Medical Information Work Requirements" dated February 9, 2011 stating that claimant is permanently unable to work because of "Chiari uln/formation[;] Degeneration disc neck [; and] osteo arthritis shoulder" with on onset date of October 2002 (doc. 8, at 3); a form also entitled "Request for Medical Information Work Requirements" dated August 9, 2010 stating that claimant is permanently unable to work because of "Chiari malformation[; and] arthritis [illegible] shoulder" with an onset date of October 2002 (doc. 8-1, at 1); a Consent Decree from the Circuit Court of Clay County, Alabama approving a settlement between claimant and her employer for worker's compensation benefits and vocational benefits; and

pharmacy records dated from December 2010 and January 2011.

## VI. Discussion

The court acknowledges that claimant's *pro se* status, her inability to speak and write English, and her submission of a letter instead of a legal brief raise challenges both to the Defendant, in attempting to respond, and to this court, in addressing the case. However, the multiple errors in the Commissioner's decision are so clear and so troubling that this court finds that remand is appropriate and necessary.

The first error that this court addresses is the ALJ's incorrect application of the Medical-Vocational Guidelines (grids) by using the claimant's age at the alleged onset date for the "age" in the guidelines.

If an ALJ determines at step four that the claimant is unable to perform past relevant work, the ALJ may use the grids to determine the claimant's disability. 20 C.F.R. § 404.1569 ("We apply these rules in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work."). The grids are only determinative of disability when all findings of fact are the same as the rule and the claimant's limitations are only exertional. *Id.* ("If the findings of fact made about all factors are the same as the rule, we use that rule to decide whether a person is disabled."); *see* 20 C.F.R. § 404.1569a ("When your impairment(s) and related symptoms only impose exertional limitations and your specific vocational profile is listed in a rule contained in Appendix 2 of this subpart, we will directly apply that rule to decide whether you are disabled."). In applying the grids, an ALJ *should use the claimant's age at the time of decision, not at the alleged onset date*. *See Crook v. Barnhart*, 244 F. Supp. 2d. 1281, 1283 (N.D. Ala. 2003) (citing *Varly v. Secy'y of*

14

*Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987)) ("For purposes of determining age under the grids, 'the claimant's age as of the time of the decision governs.'"). While the Eleventh Circuit has not explicitly held that a claimant's age at the time of decision should be used, multiple cases specifically use the claimant's age at the time of decision or hearing when reviewing an ALJ's application of the grids. *See, e.g.*, *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding the claimant was "closely approaching retirement age" (age 60 or over) under the grids since he was sixty-one *at the time of the hearing*). Although *Diorio* conflicts with *Crook* by using the age at the time of the hearing versus at the time of the decision, the difference is not relevant to this case. At either time, the claimant in this case would have been forty-six years old instead of forty-four, as used by the ALJ.

  In the instant case, claimant's age calculation was crucial in determining whether she was disabled when applying the grids. The ALJ determined that the claimant's limitations were only exertional and used the grids to determine disability. However, the ALJ should have used the claimant's age at the time of the decision or hearing, not the claimant's age at the alleged onset date to calculate her disability under the Medical-Vocational Guidelines. The claimant was forty-four years old at the time of the alleged onset date, but forty-six years old at the time of the ALJ's decision or hearing. After applying the ALJ's findings of a sedentary RFC, unskilled work experience, and inability to speak English with the revised age of forty-six, Medical-Vocational Guideline Rule 201.17 directs a finding of "disabled." *See* 20 C.F.R. Part 404 Appendix 2 to Subpart P Rule 201.17 (requiring a decision of "disabled" for a "younger individual 45-49" who is "illiterate or unable to communicate in English," with previous work experience of "unskilled or none"). Thus, the ALJ erred by incorrectly applying the grids to find claimant "not disabled,"

and substantial evidence does not support his decision as affirmed by the Appeals Council.

The court recognizes that the *pro se* claimant did not specifically identify the error of misapplying the grids in her letter/brief. Curiously, the Commissioner's brief did not argue that the ALJ *correctly* applied the grids, but the brief ignored the grid application and analyzed the case as if the ALJ relied instead on the VE's testimony. However, the ALJ did not rely on VE's testimony in step 5 of his analysis. Although the ALJ cited the VE's testimony that claimant could not perform her past work in step 4, the ALJ simply applied the grids in step 5. The VE testified that the sedentary jobs she identified "would all require the use of, bi-lateral handling on a fairly constant basis" so a person "limited [to] occasional use" of her right arm could not perform that work. (R. 50). The ALJ did not find that the claimant had full use of both arms; he found that the "Claimant's medically determinable impairments could reasonably be expected to produce the [sic] *some* limitation of function in her right arm," although not the full loss of right arm use that claimant was proposing. (R. 21) (emphasis in original). Perhaps in light of the ALJ's finding of *some* right arm limitation and the VE's testimony regarding the need for bilateral use of both arms, the ALJ chose not to rely on the VE testimony. In any event, the VE did not specifically testify that a person with some limited use of her right arm could perform the jobs identified, as the Commissioner now appears to be suggesting. If, in focusing on the VE's testimony instead of the grids, the Commissioner is tacitly acknowledging that the ALJ erred in applying the grids, the court would appreciate his saying so outright. If he is further arguing that any error is harmless because substantial evidence nevertheless supports the decision, the court disagrees.

The court sees other errors in the ALJ's decision. One example is the ALJ's failure to

16

address her Arnold-Chiari formation as a severe condition.  Three of the claimant's treating physicians found, based on an MRI report, that she had Arnold-Chiari malformation resulting in brain herniation at the base of her skull. Two of those three doctors, Dr. Howarth and Dr. Davis, specifically related the malformation to her neck pain, and the third, Dr. Hofammann, repeatedly referred her to neurosurgeons to see if the MRI findings could explain her arm and shoulder pain. Dr. Howarth also referred her to a neurosurgeon, characterizing her condition as  "very serious ... could cause death or permanent weakness, numbness," and urging her to see a neurologist. (R. 160-1).  When Dr. Howarth learned at a follow up appointment that claimant had not followed his advice to see a neurologist, citing her lack of insurance, the doctor's strong reaction is significant, because it reflects the serious nature of her illness: he reiterated that the condition "could be life-threatening" or cause paralysis and that she must receive a neurological evaluation even if she had to borrow money to do so.  However, the court notes that the claimant's failure to follow the doctor's direction, where she cited poverty and lack of insurance as the reasons for noncompliance, is not a proper reason to deny disability benefits; poverty excuses noncompliance.  *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).

      Given the numerous treating physician records characterizing the claimant's Arnold-Chiari malformation as serious and potentially life-threatening and related to her neck, arm, and shoulder pain, the ALJ was required to list it as a severe medically determined impairment under step two and address it in subsequent steps of his analysis.  To the extent that the ALJ's opinion can be read as finding that the Arnold-Chiari malformation does not relate to the claimant's neck, arm, and shoulder pain, the treating physicians' records do not support such a finding.  Some of the medical records reflect that the malformation does not relate to *her on-the-job shoulder*

*injury*, but that finding does not mean that the malformation does not relate to *her neck, arm, and shoulder pain*; the two are different. For this court's purposes, if the claimant suffers from disabling pain, she is disabled whether the cause is an on-the-job injury or another condition. As noted above, two of her three treating physicians opined that a relationship existed between the malformation and her pain, and the third doctor referred her to a neurologist to explore whether the malformation was causing her pain.

Clearly established law provides that absent a showing of "good cause," the Secretary must accord substantial or considerable weight to the opinions of treating physicians. *Crawford*, 363 F.3d at 1159; *see also* § 1527(d) (stating that generally, the ALJ must give more weight to the opinion of a doctor who has examined a claimant than to the opinion of one who has not). Therefore, the ALJ must specify the weight accorded to each treating physician's opinion. *MacGregor*, 786 F.2d at 1053. If the ALJ gives less weight to the opinion of a treating physician, he must clearly articulate the reasons for doing so, and the failure to clearly articulate his reasons constitutes reversible error. *Lewis*, 125 F. 3d at 1440. Further, substantial evidence must support the articulated reasons. *Marbury*, 957 F.2d at 841.

However, in this case, the ALJ did not follow these obligations. In failing to address the claimant's Arnold-Chiari malformation as a severe impairment, the ALJ ignored the treating physicians' opinions about the seriousness of the Arnold-Chiari malformation and its relation to claimant's pain. In his decision, the ALJ did not even specify the weight he gave to the opinions of those physicians, much less provide good cause for rejecting them. Therefore, the court finds that the ALJ committed errors in failing to address the Arnold-Chiari malformation as a severe impairment and in improperly ignoring her treating physicians' opinions related to that condition.

In light of those errors, substantial evidence does not support the Commissioner's decision.

The court recognizes that the *pro se* claimant's letter did not specifically identify legal errors such as the ALJ's failure to address the Arnold-Chiari malformation as a severe impairment at step 2 and step 4 or his failure to provide good cause for rejecting treating physicians' opinions regarding that condition. However, the Commissioner's brief referred to her Arnold-Chiari malformation, although it omitted doctors' references to its severity, and thus, the Commissioner was aware of this condition and the ALJ's failure to address it.

In light of these findings of error based on the current administrative record, the court need not address the other identified issues, including whether claimant's submission of additional evidence at this level warrants remand pursuant to sentence six of U.S.C. § 405(g) for consideration of the additional documents. On remand, the Commissioner may consider whether that evidence relates to the relevant time period and whether it otherwise meets the standard for inclusion in the record.

### VII. Conclusion

For the reason stated, this court concludes that substantial evidence does not support the Commissioner's decision. Accordingly, the court finds that the decision of the Commissioner is due to be REVERSED and REMANDED. The court will enter a separate order in accordance with this Memorandum Opinion.

Dated this 28th day of March, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE